IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ALISHA BAILEY,

                Plaintiff,

v.                                                Case No. 19-1098-JWB

METAL-FAB, INC.,

                Defendant.

**MEMORANDUM AND ORDER**

Before the court is Defendant's motion for summary judgment.  (Doc. 44.)  The motion is fully briefed and is ripe for decision.  (Docs. 45, 50, 59.)  For the reasons stated herein, Defendant's motion for summary judgment is DENIED.

## I.  Uncontroverted Facts

In keeping with the standards governing summary judgment, the following statement of facts views the evidence, and all reasonable inferences therefrom, in the light most favorable to Plaintiff as the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (evidence is viewed in the light most favorable to the non-moving party on summary judgment because credibility determinations, weighing conflicting evidence, and drawing appropriate inferences are jury rather than judge functions).

Plaintiff was terminated from her position with Defendant as a "fabricator" (also known as a sheet metal assembler) on October 10, 2018, after she was diagnosed with a seizure disorder. Defendant does not dispute that Plaintiff's condition constitutes a disability within the meaning of the Americans with Disabilities Act (ADA).  (Doc. 50 at 9.)  Plaintiff contends she is a qualified

individual as defined by the ADA who can perform the essential functions of her job, with or without reasonable accommodation, and that Defendant discriminated against her on the basis of a disability by terminating her employment.  (Doc. 41 at 7.)

Defendant Metal-Fab, Inc. manufactures and provides ventilation products and services to the HVAC, hearth, and plumbing markets. Defendant is OSHA compliant and ensures that its facility is as safe as possible for all employees.  (Doc. 45 at 2.)

Defendant's operation included a large machine shop divided into work groups called shops.  Plaintiff began working as a fabricator for Defendant in August 2008.  Prior to her termination, Plaintiff worked for two and half years in the shop known as "fire damper," which was named for the part made there.  Before that, she worked in "elbow." (Doc. 50 at 9.)

Defendant's written job description for the position of Fabricator provides the following summary of duties: "Operates fabricating machines such as rivet machines, shears, rolls, breaks, presses, welding machines, forming machines such as hydro & stretch and punch, automatic equipment, that cut, shape, and bend metal plates, sheets, tubes, and structures by performing the following duties."  (Doc. 45 at 3.)  The job description listed the essential duties the employee must be able to perform, including the following:

> i. Continuously operate fabrication machinery and equipment. Reads job specifications in English to determine machine adjustments and material requirements.
>
> ii.  Frequently sets stops or guides to specified length as indicated by scale, rule, drawing specifications or template.
>
> iii. Continuously positions work piece against stops or aligns layout marks with die or blade.
>
> iv.  Continuously pushes buttons or depresses foot pedal to activate machine.
>
> v. Continuously observes machine operation to detect work piece defects or machine malfunction.

vi.  Frequently removes burrs, sharp edges, rust, or scale from work piece.

vii. Occasionally sets up and performs maintenance on fabrication and shop machines.

viii. Continuous ability to do detailed and repetitive work with speed and accuracy according to standards.

ix. Continuously performs work in a safe manner.

x. Continuously dependable.

xi. Continuously  operates any equipment needed to perform job.

xii. Performs other duties as assigned with efficiency. Assists other grades and supervisors as needed and works in other departments when needed.

(*Id.*)

The job description also describes the work environment, including:

i. While performing the duties of his job, the employee regularly works near moving mechanical parts.

ii. The employee is exposed to risk [of] electrical shock if employee does not follow instructions.

(*Id.* at 3-4.)

Although the job description says fabricators operate shears and presses, Plaintiff had never done that.  (Doc. 50-11 at 1.) Plaintiff was not required to continuously operate fabrication machinery in the fire damper shop in the two and half years before her termination.  (*Id.* at 2.)  Her job "breaking frames" was performed at a bench and used a non-mechanical press.  (*Id.*)  There were other positions in fire damper, like assembling "butterflies," that similarly did not use a machine.  The job of "catching frames" – taking frames off a machine and moving them to the bench – did not require the use of a machine. Cutting insulation and packing and labeling, which were also done in fire damper, did not require the use of a machine.  (*Id.*)

As an essential function of her job, Plaintiff occasionally "floated" to other departments operating other equipment and machines when circumstances dictated a need.  Plaintiff was

3

informed that floating was an essential function of her position in her interview.  Plaintiff worked primarily in the fire damper department, catching and breaking frames.  (*Id.* at 4.)  Plaintiff was sometimes asked to float to other departments depending on production needs.  (Doc. 45 at 5.)

On June 27, 2018, Plaintiff was driving to work and had an accident.  As Plaintiff was making a left turn onto the road to Defendant's parking lot, she drove past the intersection before she turned, causing her to turn too wide, and she sideswiped an electrical pole and fence.  She then continued on to work.  When she arrived, she noticed damage to her car window and thought that someone must have tried to break in to her car overnight.  A few hours after her shift started, Plaintiff was called to the front office.  The police were there and said they had video of her sideswiping a utility pole and fence.  Plaintiff had no memory of the incident.  She was worried that something was wrong and asked Defendant if she could be excused to go to the hospital.  She was told she would be written up for attendance if she left, so she finished her shift.  (Doc. 50 at 11.)  After work, Plaintiff's mother took her to Wesley Medical Center where she was hospitalized overnight and diagnosed with *petit mal* seizures, which are brief seizures.  (Doc. 45 at 5.)  Plaintiff was previously unaware of the condition.

Plaintiff began keeping a seizure log in June 2018 to record the seizure activity reported to her after-the-fact by her family.  (*Id.*)  Plaintiff recorded the length of her seizures by the time someone who had observed her said she was "spaced out."  (Doc. 50 at 9.) Plaintiff initially experienced an aura, which is a strong foreboding feeling.  She may look "spaced out" during an aura but she would still be conscious of what was going on.  If the aura was followed by a seizure, then she would not be able to recall how much of the time she was conscious and how much she was not.  (*Id.*)  Sometimes only the aura (and no seizure) occurred.  When that happened, someone watching might think she was "spaced out" and having a seizure, but she remained conscious of

what was going on.  An aura does not cause the same degree of confusion afterwards as a seizure.  (*Id.*)

Plaintiff's seizures occasionally cause her to lose her train of thought and to become disoriented afterwards. She has never had a seizure last longer than 45 or 60 seconds.  (Doc. 50 at 7.)  Plaintiff's seizures can cause staring spells, grinding teeth, gripping of objects with hands, and bladder incontinence.  (Doc. 45 at 5.)

On June 28, 2018, Defendants asked Plaintiff to have her physician fill out a healthcare provider form as part of an "accommodation interactive process."  On June 29, 2018, Plaintiff's physician, Dr. Hassan, gave her a permanent restriction of "No exposure to bright lights (i.e., welding) continuously."  On July 3, 2018, Dr. Hassan completed a Certification of Health Care Provider for Employee's Serious Health Condition.  (Doc. 45 at 6.)  On July 9, Dr. Hassan responded  to a request  from  Defendant by  filling  out a Healthcare Provider's Response to an ADA [Americans with Disabilities Act] Accommodation Request.  Dr. Hassan told Defendant that Plaintiff was not released to return to work and that he would decide upon follow-up in two months when she can return.  Defendant granted Plaintiff up to 12 weeks of leave under the Family Medical Leave Act (FMLA), retroactive to June 28.  On September 10, Dr. Hassan told Defendant that Plaintiff was not able to return to work without restrictions and was not able to work with limited duties.  (*Id.*)

On September 13, Defendant asked Plaintiff to have a physician complete a Health Care Provider's Form.  Defendant also sent a letter to Dr. Hassan with a job description and what was described as "a short video of the work which Ms. Bailey performs and her related working conditions at Metal Fab."  (Doc. 45 at 6.)  The video showed the two shops in which Plaintiff had worked most recently, although it did not show employees at work.  At Dr. Hassan's request,

Defendant's Human Resources Director Dan Hamel provided a second video showing individuals performing tasks Plaintiff performed and the related working conditions.  (Doc. 50 at 13.)  On September 25, Defendant sent Plaintiff a letter saying her FMLA had expired and "if you need an accommodation, please let me know."  (Doc. 45 at 6.)

On September 28, 2018, Dr. Hassan returned a Fitness for Duty certification to Defendant that stated Plaintiff was able to return to work as of October 2 with the following permanent restrictions: no welding and that machinery needs to be guarded with safety devices to prevent unexpected injury.  (*Id.*)  Dr. Hassan also determined that Plaintiff has an impairment and that when she is having a seizure, she is substantially limited in thinking, concentrating, and performing manual tasks.  He said she cannot operate machinery if it is unprotected and that she must avoid ladders, unprotected heights, or operating unprotected machines. She cannot weld. She can perform duties as long as equipment or machinery is guarded with the safety devices from unexpected injury. Dr. Hassan mistakenly dated the second part of the form 7/28/18 instead of 9/28/18.  (*Id.*)  Defendant subsequently received the same restrictions from Dr. Hassan on a form correctly dated October 4, 2018.

Defendant had two customer service positions available between June and December of 2018. Defendant determined that Plaintiff did not meet the qualifications for either position. Plaintiff confirmed that Defendant did not have any other available office positions for which she was qualified during her medical leave; her doctor would have cleared her to work in an office as opposed to her current position on the factory floor. Defendant had various maintenance tech positions available between June and December of 2018. Defendant determined that Plaintiff did not meet the qualifications for those positions.  (Doc. 45 at 7.)

Prior to her termination, Plaintiff and Hamel talked about her medical condition numerous times.  During their conversations, Plaintiff told Hamel she had *petit mal* seizures that lasted only seconds.  Despite that, Hamel assumed she had had a seizure that lasted a few minutes, because Plaintiff told him she "didn't remember any of it" on the day she ran into the fence, and he believed there was a substantial amount of time from when she hit the fence until she arrived at work.  (Doc. 50-5 at 3-4.)  Hamel did not talk to a doctor about his assumption that Plaintiff's seizures lasted a few minutes.  (*Id.* at 80.)  Hamel included his presumption that her seizures could last a few minutes in his termination letter.

Plaintiff told Hamel that when she had seizures it was like daydreaming and that she just "spaced out."  (Doc. 50 at 12.)  She told him that as soon as her seizures were under control, Dr. Hassan would release her to return to work.  She also told him her seizures did not cause her to fall. (*Id.*)  Hamel knew that people having *petit mal* seizures typically do not flail or fall.  Plaintiff never told Hamel that she injured herself or anyone else during a seizure, because she had not. (*Id.*)

Defendant determined that Plaintiff could not safely perform her job duties without an accommodation and that it could not offer her a reasonable accommodation without undue hardship.  (*Id.* at 8.)  The decision was made by Hamel in conjunction with department managers Harris, Erwin, and Gormley, as well as President Ohm ("the decisionmakers.")  (Doc. 50 at 13.) Hamel reviewed Plaintiff's medical documentation and ADA standards for accommodation and for determining whether an employee is a direct threat to the safety of herself or others, although he did not explain the company's ADA obligations or the meaning of terms such as "direct threat" to the other decisionmakers.  (Doc. 50-5 at 6, 23.[1])

---

[1] Plaintiff's deposition excerpt pages are attached to her brief in non-numerical (and apparently random) order, making it difficult to locate the evidentiary materials she cites.

Hamel first talked with Harris, the first shift plant superintendent, and asked him whether Plaintiff's restrictions would work in the facility.  Harris answered no, opining that Plaintiff was a risk to herself because of sharp objects all around and because she could put others in jeopardy working around her.  (Doc. 50 at 14.)  Harris does not remember if he knew, when he offered this opinion, anything about whether Plaintiff fell down when she had seizures, or the duration, frequency, or likelihood of her seizures.  Harris testified that no one in his conversations about Plaintiff discussed the likelihood of her having a seizure, and he did not know the likelihood.  (*Id.*) Hamel recalled discussing with Harris that "if she were to have a seizure she potentially could go down on a piece of metal and hurt herself."  (*Id.*)  Hamel and Harris discussed how Dr. Hassan's note said Plaintiff "could be unconscious for periods of time," although the note actually said Plaintiff could be briefly "unaware of her surroundings" during a seizure, not unconscious.  (*Id.*) Hamel's opinion was that no one with a seizure disorder could work at Metal-Fab, regardless of the length of the seizures.[2]  (Doc. 50-5 at 8.)

Harris testified that all of Defendant's machines were compliant with OSHA requirements for guarding.  The reason machines are guarded is so employees do not injure themselves when they are "not aware of their surroundings and what's happening." (Doc. 50 at 16.)  Hamel testified that the machines Plaintiff would encounter at work were guarded with safety devices to prevent unexpected injury.  (Doc. 50 at 16.)

Hamel identified the risk from Plaintiff working as "the potential for her to have a seizure to where she would lose consciousness in the production facility in and near the equipment, the

---

[2] Defendant disputes this characterization, but Plaintiff cites a portion of Hamel's deposition testimony from which a jury could make such a finding.  (Doc. 50-5 at 8, 19) ("Q. Is it your testimony, sir, that no one with a seizure condition can work in the shop at Metal-Fab?  A. Yes.  Q. And that is true no matter the length of the seizures?  A.  Yes.") Hamel's knowledge and opinions were apparently based in part on his personal experience with his brother-in-law, who had *petit mal* seizures and drowned as a result of one.  (*Id.* at 8, 38.)

metal, the forklifts." (*Id.* at 15.) Hamel thought there was a significant risk of harm if Plaintiff were to have a seizure near equipment because "if she would become unstable she could fall into a piece of equipment and get behind a guard or she could potentially lose her stability and push somebody else into it." (*Id.*) He believed "if she were to brace herself on something and come down she could end up slicing her – getting a laceration." (*Id.*) Hamel knew Plaintiff did not fall during her seizures. (*Id.*)

Employees other than Plaintiff had previously fallen in the shop. None of them had seizure disorders. Some had hurt themselves and some had not. It was a risk to all employees that they might fall in the shop and hurt themselves on sharp objects. (*Id.* at 16.)

Hamel testified that Plaintiff could not be around welding flashes and that was one of the reasons Plaintiff was terminated. (*Id.*) Dr. Hassan's restrictions said only "no welding," and Hamel never clarified whether that meant Plaintiff could not weld or whether she could not be in the vicinity of welding. Hamel knew he was allowed to reach out to physicians for clarification of restrictions, but he did not do so concerning the welding restriction. (*Id.*) Plaintiff told Hamel at some point she could not be around welding arcs or flashes because they might trigger a seizure. (Doc. 59 at 10.) But at Hamel's request, Plaintiff asked Dr. Hassan whether the "no welding" restriction meant she could not weld or could not be around welding. According to Plaintiff's affidavit, Dr. Hassan said, "that as long as [Plaintiff] was not the one welding, [she] could work in a shop where welding occurred." (Doc. 50-11 at 5.) Plaintiff relayed this to Hamel and he did not mention welding again. Hamel never told Plaintiff that her termination was due to an inability to be around welding. (Doc. 50 at 17; Doc. 50-11 at 5.[3])

---

[3] Defendant argues Plaintiff's version of events about the welding restriction is not inconsistent with Hamel's because her affidavit does not address whether she could work "in a shop where welding curtains do not reach the ceiling and she would be exposed to bright lights and welding arcs." (Doc. 59 at 10-11.) But viewed in the light most favorable to Plaintiff, the two versions are inconsistent, such that the court accepts Plaintiff's version for purposes of summary

Welding was not identified as an essential function on Defendant's list of essential functions.  Not all fabricators engaged in welding.  The welding in the vicinity of Plaintiff's workstation has shields so she is not exposed to welding flashes.

Hamel testified that having a seizure near a forklift would make Plaintiff a direct threat to herself or others.  The significant risk of injury he described was that Plaintiff had "the ability to walk in front of a forklift and have a space out moment where she could be injured."  (Doc. 50 at 18.)  At Metal-Fab, forklift drivers travel in the same lane and same direction as workers.  Forklift drivers must wait for employees to step aside and yield the right-of-way before the forklift proceeds.  (*Id.*)  Plaintiff does not regularly encounter forklifts in the aisles at work.  Forklift drivers work in the warehouse as well as the shop.  Fabricators are not allowed to go to the warehouse, so Plaintiff does not encounter forklifts there.  When Plaintiff would arrive for her shift, she had to walk in the forklift aisles, but the forklift drivers were arriving at the same time for their shift, so they were not driving in the aisles.  (*Id.*)  During a shift change, when Plaintiff would leave her shop for home, she would walk in a forklift aisle, but forklift drivers ordinarily avoided the area during a shift change.  Forklift drivers deliver materials to the shops, but the materials are left on the shop's outside perimeter.  Forklifts do not drive through the area where Plaintiff and her coworkers work, so Plaintiff would not encounter forklifts as she performed tasks at her bench.  During a shift, Plaintiff might encounter a forklift if she were in the aisle walking to the bathroom

---

judgment.  Plaintiff specifically inquired of Dr. Hassan whether she could be around welding and was told that she could, a fact that she relayed to Hamel.  Hamel said no more about it and did not mention it when he terminated her.  Yet, he later testified that Plaintiff's inability to be around welding flashes was a reason for her termination.  Defendant argues this after-the-fact rationale was justified by Dr. Hassan's restrictions, but those restrictions only precluded "exposure to bright lights (i.e. welding) *continuously*."  (Doc. 45 at 5) (emphasis added.)  A reasonable finder of fact could determine that the restriction did not prevent Plaintiff from working in the shop merely because welding curtains might not completely obscure welding arcs and flashes, and moreover that Hamel was or should have been aware of Dr. Hassan's conclusion that Plaintiff could safely work around welding.

or going to the office or somewhere outside.  At most, she might be in a forklift aisle while a forklift is traveling a few times a week. (*Id.* at 18-19.)

Near the bathrooms there is a chain that is put up when forklifts are putting parts on the machines there.  The chain is a safety device to keep workers from walking in front of a forklift or into an area where the driver might have a hard time seeing an employee or the employee might have a hard time seeing the forklift.  No Metal-Fab forklift driver has ever run into a pedestrian, although workers (other than Plaintiff) who weren't paying attention have walked in front of forklifts causing "close calls."  Forklift drivers have always been able to avoid an accident in these situations.  Forklifts are equipped with horns and beepers to warn pedestrians and with brakes to avoid them.  Hamel also testified that Plaintiff was a direct threat because there was a risk that she could walk in front of a forklift and the driver could swerve to miss her and hit a co-employee.  Such a scenario has never happened at Metal-Fab.  (Doc. 50 at 19.)

Ohm, the company president and CEO, testified that he and Hamel decided to terminate Plaintiff after input from other managers.  He testified no one had explained the definition of "direct threat" to him and he never saw Plaintiff's medical restrictions, although he discussed the restrictions with Hamel or others. Ohm testified there was no discussion of the likelihood of Plaintiff being injured, nor was there any discussion of the imminence of her injury.  (*Id.* at 15.)

On October 10, 2018, Hamel called Plaintiff and terminated her employment.  Defendant sent a letter confirming the phone conversation and the termination.  (Doc. 45 at 8.) Hamel told Plaintiff it was not safe for her to be around machinery.  Hamel did not mention welding or forklifts as being dangers in either the phone call or the termination letter.  (Doc. 50 at 19.)

 Prior to her termination, on September 27, 2018, Plaintiff filled out a "Function Report" as part of her application for Supplemental Security Income ("SSI").  She reported that, as of

September 27, she "can't work, can't drive, [has] issues with incontinence and can't focus or concentrate very well and get[s] confused." (Doc. 45 at 8.)   She further reported that "[d]uring and after any seizures [she] get[s] really tired, confused, headaches, memory loss, loss of focus briefly." (*Id.*)   She reported that her stair climbing, memory, ability to complete tasks, concentration, and understanding have all been affected by her seizure disorder. (*Id.*)

Plaintiff had brief seizures while she was on leave (from July-September 2018) prior to her termination.  By the time of her termination she had been seizure-free for almost a month. (Doc. 50-11 at 3.) Over the next seven months, she had only 35 seconds of seizure activity of the "staring" kind, though on occasion she had auras, which can be but are not necessarily a precursor to a seizure. (*Id.*)   Since June of 2019, Plaintiff has had neither seizures nor auras because her medication controls both. (*Id.*; Doc. 50-2 at 7.)  Plaintiff does not allege that she told Defendant she had been seizure-free for a month at the time of her termination, although she testified she told Hamel that Dr. Hassan would release her to return to work as soon as her seizures were under control. (Doc. 50 at 12.)  Dr. Hassan signed a release on September 28, 2018, and again on October 4, 2018.  (Doc. 45 at 6.)

Terry Cordray, M.S., C.R.C., is a vocational expert who completed an evaluation of Plaintiff's medical records, job description, and other records and opined that, other than forklifts, there were no dangers that would make it unsafe for Plaintiff to work at Metal-Fab.  Cordray testified he would have to find out if there were forklifts in Plaintiff's work area because, if there were, his opinion "will be that she should not be around moving forklifts given her seizure activity and that she would not be safe to work in that area." (Doc. 50 at 8.)  Cordray's testimony indicated that an employee who cannot be exposed to welding flashes can be protected by curtains that go to the ceiling.  (*Id.* at 17.)

Steve Benjamin, M.S., C.R.C., is a vocational expert who completed an evaluation of Plaintiff's medical records, job description, and other records and opined that Plaintiff could safely perform her job duties at Metal-Fab with accommodations.  Benjamin had spent six years at Boeing developing in-house accommodations in machine shops and was very familiar with the type of machinery at Defendant's shop.   Benjamin's evaluation included a tour of the plant with Defendant's director of manufacturing and an examination of the shops where Plaintiff worked. (*Id.* at 8.)  During his tour, Benjamin saw a spot welder with a welding screen across the aisle and another area with screens that completely blocked out the welding flashes.  (*Id.* at 17.)  Benjamin read the first part of Dr. Hassan's limitation ("Avoid activities which sudden loss of consciousness may expose her to risk or injury") as a general statement of the goal and the next section as specific instructions as to how to do that: "Avoid ladders, climbing on unprotected heights and operating unprotected machinery." (*Id.* at 20.)  Plaintiff's job did not require that she climb ladders or work at unprotected heights.  (*Id.*)  Benjamin found no trip hazards in the shops where Plaintiff worked, found machines had guards and shields in place, found foot actuators or safety beam sensors, and standard safety features.  (*Id.* at 21.)  Benjamin's opinion was that the machinery guards were satisfactory to accommodate Plaintiff working there safely.  (*Id.*)

Benjamin did not believe that sharp objects in the shop were an issue for someone with *petit mal* seizures because such persons generally do not fall.  Benjamin had worked with quite a few people with *petit mal* seizures who "just stare off in space for a while" and "don't generally fall." (*Id.*)  Benjamin believed Plaintiff could safely work within Dr. Hassan's limitations if she was not required to weld.  He testified she could "walk in today and go back to her station and perform her job safely without risking harm to herself or others." (*Id.*)  Benjamin did an analysis of the direct threat criteria and said that because *petit mal* seizures were 90 seconds or less they

13

were of brief duration.  He opined that Plaintiff's risk of falling or cutting or hurting herself "isn't more likely than anyone else falling in the work area."  (*Id.*)  He did not consider any harm to Plaintiff to be imminent from her condition.  (*Id.*)

Plaintiff was unemployed from November 2018 until February 13, 2020, when she worked one week. She has been employed full-time as an assembler since March of 2020.  (Doc. 45-9 at 3.)

## II.  Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id.* Any statement of fact that has not been controverted by Plaintiff's affidavit or an exhibit is deemed to be admitted. D. Kan. Rule 7.4. Also, the court will only consider facts based on personal knowledge or supported by exhibits. Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.  Analysis

1.   <u>Ability to perform essential functions</u>.   The ADA prohibits employers from discriminating against "a qualified individual on the basis of a disability."  42 U.S.C. §12112(a). To establish a prima facie case of discrimination, a plaintiff must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability.  *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015).  Establishing a prima facie case "is not onerous" and may be inappropriate for summary determination when the employee cites evidence that she can perform the essential functions of the position with the aid of an accommodation.  *Id.* (citations omitted.)

For purposes of the instant motion, the only prima facie element in dispute is whether Plaintiff is qualified to perform the essential elements of her position.  In determining this issue, courts typically use a two-part inquiry, that first asks whether the individual can perform the essential functions of the job.  If the individual is unable to perform the essential functions, the court determines whether any reasonable accommodation by the employer would enable her to perform those functions.  *Id.* at 1267 (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, (10th Cir. 2003)).  Plaintiffs bears the burden of showing she can perform the essential functions.  *Id.* Reasonable accommodation refers to "those accommodations which presently, or in the near future, enable the employee to perform the essential functions of [her] job."  *Aubrey v. Koppes,*, ___F.3d___, 2020 WL 5583649, at *7 (10th Cir. Sept. 18, 2020) (quoting *Lincoln v. BNSF Ry.*, 900 F.3d 1166, 1205 (10th Cir. 2018)).

Defendant contends Plaintiff fails to show she is capable, with or without accommodation, of performing the essential functions of the position.  Defendant argues that Plaintiff's impairment prevents her from being able to work safely "in a factory setting around dangerous machinery."

(Doc. 45 at 13.)  Defendant also argues there is no reasonable accommodation that would allow Plaintiff to float between departments because "even walking between departments or to the restroom would cause Plaintiff to cross the main aisles of the factory floor and enter the path of forklifts." (*Id.*)  Defendant contends Plaintiff's restriction of avoiding activity where a sudden loss of consciousness would expose her to harm, and the fact that her seizures may cause her to grip things with her hands, mean she could be injured if she "spaced out" or lost consciousness in the middle of an aisle or near a machine.  (*Id.* at 14.)

Plaintiff has cited evidence that she can perform the essential functions of her position with reasonable accommodations.  In that regard, the uncontroverted facts do not show that Plaintiff's medical restrictions prohibit her from performing any essential function identified by Defendant. *See Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 593 (5th Cir. 2016) (citing *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir.2003) ("The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden.").  With respect to operating machinery, Plaintiff has cited evidence that her restrictions permit her to perform this function provided the machinery is equipped with safety devices.  (Doc. 41 at 3-4.) Plaintiff has cited evidence that the machinery in the two shops where she worked was in fact already equipped with such devices.  (Doc. 50-5 at 12-13.)  Plaintiff's vocational expert, Steve Benjamin, took a tour of Defendant's facility and observed that "all of the machines had some types of guards." (Doc. 50-8 at 6.)  *See also* Doc. 50-8 at 18 ("All the machines had safety features including foot actuators, safety buttons and cages/guards.")  In his opinion, the guards were sufficient to accommodate someone with *petit mal* seizures.  (*Id.* at 7.)  This evidence, if accepted by a jury, could support a finding that Plaintiff could perform the essential function of operating machinery with a reasonable accommodation requiring the use of safety-guarded

machines.  Although Defendant argues in part that "adding additional protective guards to each piece of machinery Plaintiff might be required to work on … would have been costly and burdensome" (Doc. 45 at 13), this assertion is unavailing for two reasons.  First, Plaintiff cites evidence that the relevant machines already have adequate safety guards.  Second, at this stage of the proceedings, Plaintiff makes a prima facie case by citing evidence that a facially plausible accommodation exists – namely, the addition of safety guards of a type already widely in use at Defendant's facility – that would allow her to perform the essential function of operating machinery.  Plaintiff's showing is sufficient to meet her burden.  *Cf. Osborne,* 798 F.3d at 1267 (employee "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases.'") (quoting *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)); *Hunt-Watts v. Nassau Health Care Corp.,* 43 F. Supp.3d 119, 133 (E.D.N.Y. 2014) ("It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." ) (citation omitted.)  That showing makes it Defendant's burden to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances."  *US Airways*, 535 U.S. at 402.  Defendant has not cited uncontroverted evidence establishing undue hardship at this stage, meaning it is not entitled to summary judgment on the issue.

Defendant also argues Plaintiff cannot perform the essential function of floating between departments because of the danger of injury from a forklift if she were to have a seizure.  (Doc. 45 at 13-14.)  Assuming that floating between departments is in fact an essential function of Plaintiff's position, and that it would sometimes require Plaintiff to move about in areas where forklifts operated, Plaintiff has nevertheless cited evidence that she can perform this function with or without a reasonable accommodation.  Plaintiff's physician reviewed the conditions under which

Plaintiff performed her job and imposed no medical restrictions relating to working or moving around forklifts.

Defendant does not argue that Plaintiff is physically incapable of floating between departments, nor does it identify a medical restriction that clearly prohibits it.  Rather, Defendant asserts that Plaintiff's performance of the function would pose a direct threat to her own safety or the safety of others.  "Under the ADA it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of [herself] or others."  *Justice v. Crown Cork and Seal Co., Inc.,* 527 F.3d 1080, 1091 (10th Cir. 2008) (citation omitted.)  *See* 42 U.S.C. §12113(b) (qualification standards may require than an individual "shall not pose a direct threat to the health or safety of other individuals in the workplace.") A direct threat means "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. §12111(3).  The defense ordinarily requires the employer to show that it reasonably determined that the employee posed a direct threat to herself – in other words, that the employer's decision was "objectively reasonable."  *EEOC v. Beverage Distribs. Co., LLC,* 780 F.3d 1018, 1021 (10th Cir. 2015) (citing *Jarvis v. Potter,* 500 F.3d 1113, 1122 (10th Cir. 2007)).[4]

The regulations implementing the ADA explain that:

The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

---

[4] "Though the burden of showing that an employee is a direct threat typically falls on the employer, 'where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that she can perform those functions without endangering others.'" *Justice,* 527 F.3d at 1091 (citation omitted.)  Because Defendant has cited no evidence establishing that Plaintiff's seizure condition posed a significant threat to other employees, the court finds Defendant has the burden of showing that Plaintiff posed a direct threat to herself. Defendant's suggestions that Plaintiff might have a seizure and fall into another employee or cause a forklift driver to swerve and hit another employee are entirely speculative and are insufficient to shift the burden to Plaintiff.

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. §1630.2.  These factors have been summarized as "the nature, duration, severity, and probability of the risk."  *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1277 (10th Cir. 2015).

Application of these factors to the uncontroverted facts shows Defendant is not entitled to summary judgment.  The only medical judgment in the record is that of Dr. Hassan, who after being apprised of Plaintiff's job conditions opined that she was able to perform the job with restrictions including no welding and using machinery with safety devices.  He expressed no concern and imposed no restriction relating to working around forklifts.  With respect to the duration, nature, and likelihood of the risk, a jury could find that Defendant lacked objective evidence of a significant risk to health or safety.  Plaintiff cites evidence that by the time of her termination, she had been seizure-free for nearly a month because her seizures were then being controlled by medication.  Although no evidence is cited that Defendant was made aware of this fact, the regulations require an employer claiming a direct threat to consider the employee's "present ability" to perform safely based on "a reasonable medical judgment that relies on the most current medical knowledge" or other objective evidence. 29 C.F.R. §1630.2.  A reasonable jury could find Defendant could have and should have sought a current medical opinion concerning the effect of Plaintiff's medication on her seizures before it terminated her.  Plaintiff also cites evidence that her seizures typically lasted only a matter of seconds and never caused her to fall.  Yet Defendant apparently assumed to the contrary without any objective medical evidence to support its assumptions. Plaintiff further cites evidence indicating the risk of injury from a forklift

to *any* of Defendant's employees is quite low.  In fact, Defendant has never had any such injury at its facility.  Defendant has "rules of the road" in place that require forklift drivers to yield to pedestrians.  Although there have been some close calls, drivers have heretofore been able to avoid any collisions, including with employees who were not paying attention and who walked in front of forklifts.  The potential harm from a forklift-pedestrian collision could be quite severe.  At the same time, the probability of Plaintiff having a seizure that would cause her to unexpectedly stop in the path of a forklift, while at the same time a forklift driver would fail to see her and/or fail to yield the right-of-way or avoid a collision, could be found exceedingly low.   Other than hypothesizing such a scenario, Defendant cites no evidence that Plaintiff's disability creates a significant risk of such an accident that is above and beyond the risk faced by all of Defendant's employees.  A jury viewing all of the evidence in the light most favorable to Plaintiff could find any probability that Plaintiff would be injured by a forklift as a result of a seizure – even though theoretically possible – was not a significant risk. *Cf. Justice,* 527 F.3d at 1092 ("while the risk of harm may be been permanent and the severity of the harm great, a reasonable jury could conclude that the likelihood of harm was extremely small and that Justice therefore did not pose a 'direct threat' to the safety of himself or others in the … plant.")  Moreover, even if the risk were found substantial, Plaintiff has cited facially reasonable accommodations that could eliminate the significance of the risk.  For example, Plaintiff argues she could be required to take breaks at specific times when forklifts were elsewhere, she could wear reflective clothing in aisleways to alert forklift drivers, safety chains could be positioned to prevent accidents, or a co-worker could accompany her on those occasions when she has to cross an area where forklifts are present.  (Doc. 50 at 33.)  As such, Plaintiff has cited evidence that she can perform the essential function of floating between departments with or without reasonable accommodation.

Defendant similarly proposes that Plaintiff's potential for gripping things with her hands as the result of a seizure or losing consciousness near a machine pose a direct threat to Plaintiff's safety or to others.  (Doc. 45 at 14.)  But Dr. Hassan reviewed the conditions of Plaintiff's job and imposed no restrictions on working with sharp objects or near machinery (except to require that the machinery be guarded).  Moreover, a jury viewing the evidence in Plaintiff's favor could find the probability of Plaintiff having a seizure that causes her to grip a sharp object is not only remote, but also that such an occurrence would be unlikely to cause severe harm, such that the risk is not significant.  As for the potential of Plaintiff having a seizure near machinery, the evidence shows Defendant's machinery already has safety guards attached to prevent injury resulting from employee inadvertence, and Plaintiff has cited evidence that her seizures do not put her at a significantly heightened risk of falling into nearby machinery.

Finally, restrictions from Dr. Hassan prevented Plaintiff from welding, but Defendant does not expressly argue – and the uncontroverted facts do not show – that welding was an essential function of Plaintiff's position.  Rather, Defendant argues the welding restriction or the restriction on continuous exposure to bright lights meant Plaintiff "could not be in a shop where welding curtains do not reach the ceiling and she would be exposed to bright lights and welding arcs." (Doc. 59 at 11.)  But Plaintiff has cited evidence that Dr. Hassan clarified that her restrictions did not prevent her from being in the shop around welding, a fact she allegedly made known to Defendant.  Moreover, she cites evidence that protections were already in place – including shields and welding curtains – to adequately screen her from any potentially harmful light flashes.  (*See* Doc. 50-8 at 1) (Benjamin testimony that welding screens completely blocked out flashes from welding).  Finally, even assuming the existing welding curtains might be inadequate to protect Plaintiff because they did not reach all the way to the ceiling, Plaintiff has satisfied her obligation

to make a prima facie case by identifying the facially plausible accommodation of installing or extending welding curtains to the ceiling, something Defendant's vocational expert identified as a measure that would adequately protect a worker from exposure to bright lights.  (Doc. 50 at 7; Doc. 50-9 at 1.)

In sum, the court finds Plaintiff has cited evidence that she can perform the essential functions of her position with reasonable accommodations.

2.  Whether Plaintiff has shown a genuine issue for trial as to Defendant's determination of a direct threat.  Defendant argues that its reason for terminating Plaintiff's employment – that is, because it determined she could not perform the essential functions of her position without presenting a direct threat to herself and others – is a legitimate, non-discriminatory reason, and that Plaintiff has failed to cite evidence that it was a pretext for unlawful discrimination.  (Doc. 45 at 15-18.)  In response, Plaintiff argues that a pretext analysis is unnecessary because Defendant has conceded that her disability was the reason for the termination.  (Doc. 50 at 22) (citing *Osborne*, 798 F.3d at 1266, n.6) (noting that if an employer admits that the disability played a prominent part in its decision, the standard burden-shifting framework may be unnecessary). Rather, Plaintiff argues that Defendant's determination that she was a direct threat to herself or others was not objectively reasonable.  (Doc. 50 at 23.)  Among other things, Plaintiff asserts that Defendant's determination was not based on appropriate factors or evidence, was contrary to the available medical evidence, and failed to consider whether reasonable accommodations would allow her to perform the job without the asserted danger.  (*Id.* at 27-33.)  As Plaintiff argues, the "direct threat" defense turns upon whether its use by an employer is objectively reasonable. *See Bragdon v. Abbott,* 524 U.S. 624, 650 (1998) (courts should assess the direct threat defense under an "objective reasonableness" standard).  Regardless of whether Defendant's determination is

analyzed in terms of pretext or objective reasonableness, however, the court finds for the reasons discussed herein that a genuine issue of material fact exists and precludes summary judgment.

A plaintiff can show pretext by demonstrating that the proffered reason is false or that discrimination was a primary factor in the determination.  This may be done by pointing to "weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Aubrey,* 2020 WL 5583649, at *14 (citation omitted.)  By contrast, under *Jarvis* and similar cases, "the fact finder's role is to determine whether the employer's decision [that the employee posed a direct threat] was objectively reasonable." *Jarvis,* 500 F.3d at 1222.  Objective reasonableness is not satisfied merely because an employer acted upon a good-faith belief.  *Id.* Objective reasonableness may require the employer to obtain professional advice or other objective evidence.  *Id.* at 1123 (noting 29 C.F.R. §1630.2(r) requires an assessment based on reasonable medical judgment).  It also requires an individualized assessment rather than a judgment based upon predetermined or unfounded general stereotypes. *Id.* (citing *Den Hartog v. Wasatch Acad.,* 129 F.3d 1076, 1090 (10th Cir. 1997)).

Plaintiff has cited evidence to show a genuine issue of fact under either standard.  The uncontroverted facts show that Defendant's decision to terminate Plaintiff's employment was lacking in objective justification and could be found unworthy of credence.  For example, the decision was based in part on input from Harris, the first shift superintendent who thought Plaintiff was a danger "because of sharp objects all the way around."  (Doc. 50 at 14.)  That was apparently based on Harris's belief that Plaintiff was apt to fall if she had a seizure.  Harris and Hamel discussed that if Plaintiff had a seizure she "could go down on a piece of metal."  (*Id.*)  If so, the belief was lacking objective justification, as there was no evidence that Plaintiff had fallen or was

likely to fall as a result of a seizure. According to the uncontroverted evidence, Plaintiff's seizures usually involved a short lapse in concentration and had never resulted in a fall.  A jury could conclude that Harris's opinion was not based on individualized consideration of Plaintiff's disability, but was based on unfounded assumptions about persons who have seizures.  Harris does not remember if he knew anything about whether Plaintiff fell when she had seizures or the duration, frequency, or likelihood of her seizures, and testified that he and Hamel did not discuss the likelihood of Plaintiff having a seizure.

Hamel's proffered explanation of the danger was similarly premised on beliefs or suppositions lacking objective support.  Hamel's opinion was based in part on a belief that if Plaintiff had a seizure "she would become unstable [and] she could fall into a piece of equipment." (*Id.* at 15.)  Again, the danger of falling was not included in any medical opinion and Plaintiff specifically informed Hamel she did not fall as a result of her seizures.  According to Harris and Hamel, they were concerned about the danger of Plaintiff having a seizure while working with or around machinery, but a jury could conclude that they failed to take into account the available medical evidence on that issue.  Dr. Hassan indicated Plaintiff could safely work with machinery as long as it had safety devices built in, as Defendant's machinery did.  Hamel's determination was also based in part on an erroneous and unfounded assumption about the length of Plaintiff's seizures.  He assumed, based solely on Plaintiff's comment about not remembering the circumstances of her first seizure, that her seizures lasted "a few minutes." (*Id.* at 11-12.)  But Hamel never sought or obtained any information about the length of seizures from Plaintiff's doctor.  Plaintiff informed Hamel that her seizures usually lasted only a matter of seconds, and there is evidence Plaintiff never had a seizure last more than 60 seconds.  Another person involved in the termination decision, CEO Ohm, testified there was no discussion about the likelihood of

Plaintiff being injured as the result of a seizure.  None of the decisionmakers apparently considered the frequency or likelihood of Plaintiff having a seizure or sought input from Plaintiff's doctor on those issues.  Yet Plaintiff cites evidence that her seizures had largely been controlled by medication by the time of her termination.  *Cf.*  29 C.F.R. § 1630.2 ("This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.")  Plaintiff also cites evidence from which a jury could conclude that Defendant applied a "blanket rule" that did not take into account Plaintiff's actual condition. (*See* Doc. 50-5 at 8, 19) (Hamel's testimony indicating his belief that no one with a seizure condition could work safely in the shop regardless of the length of the seizures).

Hamel also testified Plaintiff's termination was based on the danger from Plaintiff crossing in front of forklifts and working around welding lights.  Yet Hamel did not mention either of these asserted dangers at the time of Plaintiff's termination.  A reasonable finder of fact could infer that they were likely after-the-fact rationalizations on Defendant's part.  Moreover, the asserted danger of working around forklifts and welding flashes was not based on any medical input from Plaintiff's doctor or from an individualized assessment of Plaintiff's condition.  Dr. Hassan specifically reviewed Plaintiff's working conditions but placed no restrictions relating to forklifts and opined that Plaintiff could be around welding as long as she was not the one welding.  Plaintiff cites evidence that she informed Hamel that Dr. Hassan said she could work in the shop where welding occurred.  Hamel was aware that he could seek input or clarification from the doctor but did not do so.  There is also evidence from which a jury could find that the decisionmakers did not consider various accommodations concerning forklifts or welding flashes that might have rendered any risk to Plaintiff or others insignificant.  Of course, because Defendant did not inform Plaintiff of these asserted concerns before it terminated her employment, she had no opportunity to request

any such accommodations.  Plaintiff has now identified facially plausible accommodations that would minimize or eliminate the asserted risks from forklifts and welding lights, thereby placing the burden on Defendant to show undue hardship.

Defendant's decision to terminate Plaintiff's employment may have been based on a good-faith belief that Plaintiff faced a significant risk of harm from working on the shop floor.  But a reasonable jury viewing the evidence and all inferences in Plaintiff's favor might conclude that Defendant's invocation of the risk of harm is lacking in objective justification and is not worthy of credence.  *Cf. Justice*, 527 F.3d at 1089 ("Crown argues that Justice's medical restrictions precluded him from working as an electrician because, under its version of the facts, the Worland plant was full of obstacles such as unprotected heights and hazardous machinery. While this may be true, there is contrary evidence in the record from which a finder of fact could conclude that these hazards were imagined or exaggerated, and that Crown's purported reliance on Justice's medical restrictions was a pretext masking Crown's irrational fears about Justice's condition.")

**IV. Conclusion**

Defendant's motion for summary judgment (Doc. 44) is DENIED.  IT IS SO ORDERED this 15th day of October, 2020.

_____ s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE